UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

A.P.A.,

                                Petitioner,

                -against-

Paul Arteta et al.,

                                Respondents.

26-cv-3334 (AS)

<u>OPINION AND ORDER</u>

ARUN SUBRAMANIAN, United States District Judge:

The petitioner in this habeas corpus action is currently in immigration detention. Respondents justified his detention under 8 U.S.C. § 1225(b)(2)(A), but the Second Circuit has since rejected their reading of the statute and has held that petitioners like the one in this case may be detained only under 8 U.S.C. § 1226(a). Given the Second Circuit's decision, there is no question that petitioner's rights were violated. The main question in this case is what relief is due. The Court concludes that petitioner is not entitled to immediate, unconditional release, but is entitled to a fresh custody determination and, if necessary, a burden-shifted bond hearing in front of an immigration judge.

## BACKGROUND

Petitioner A.P.A. is an Ecuadorian citizen who entered the United States without inspection around 2017. Dkt. 1 ¶ 1, 21; Dkt. 10 ¶ 3.

In May 2022, he pleaded guilty to one count of sexual misconduct in violation of New York law. Dkt. 1 ¶ 23; Dkt. 10 ¶ 5. He was sentenced to six years of probation. Dkt. 10 ¶ 5. In November 2022, he was detained by federal immigration agents and charged with being an alien present in the United States without being admitted or paroled. *Id.* ¶¶ 7–8; Dkt. 1 ¶ 24. The following month, he applied for asylum, withholding of removal, and protection under the Convention Against Torture. Dkt. 1 ¶ 25.

In February 2023, while his application was pending, A.P.A. was granted bond by an immigration judge (IJ) and released from custody on a $8,000 bond. Dkt. 1 ¶ 26; Dkt. 10 ¶¶ 17–18. A.P.A.'s application for asylum and other relief was subsequently denied; his appeal to the Board of Immigration Appeals (BIA) remains pending. Dkt. 1 ¶¶ 29–30; Dkt. 10 ¶¶ 24, 34.

In March 2026, A.P.A. was arrested by police in the town of Ramapo, New York and charged with criminal impersonation and identity theft in violation of state law. Dkt. 10 ¶ 35. Those charges remain pending. After the Rockland County Jail notified federal authorities of A.P.A.'s arrest, he was detained by Immigration and Customs Enforcement (ICE) agents pursuant to a warrant. *Id.*

¶¶ 36–37. The government's stated basis for his detention was 8 U.S.C. § 1225(b)(2)(A), *id.* ¶ 39, which mandates detention in most cases for "an alien who is an applicant for admission."

A.P.A. filed the instant habeas petition on April 22, 2026. Dkt. 1. He sought release, or in the alternative, a bond hearing before the Court or an IJ with the burden on the government to justify detention. *Id.* at 29 ¶¶ 4–5.

On April 28, 2026, the Second Circuit released its opinion in *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026). As relevant here, that court held that 8 U.S.C. § 1225 "does not apply to such noncitizens, who are present in the United States after entering the country without inspection and admission, and who were not apprehended while entering the country or shortly thereafter." *Id.* at 69. In effect, it rejected the government's stated grounds for detaining A.P.A. Instead, the court held that detention of people like A.P.A. is governed by 8 U.S.C. § 1226(a). *Id.* That section says that "an alien *may* be arrested and detained" pending a decision on removal but does not mandate detention like Section 1225 does. 8 U.S.C. § 1226(a) (emphasis added).

Following the Second Circuit's decision, ICE conducted an individualized custody determination for A.P.A. on May 4, 2026. Dkt. 18-1. The agency decided to detain A.P.A. under Section 1226(a) based on his prior conviction and his pending charges in state court. *Id.* at 2. A.P.A. was advised that he could challenge the determination in front of an IJ, but he did not immediately seek review. *Id.* at 4.

## DISCUSSION

I.   **Respondents confirm adherence to the requirements of the *Velesaca* settlement in all cases in this district, including this one**

In 2022, ICE's New York City Field Office agreed to settle a class action challenging policies for noncitizens detained under Section 1226(a). *Velesaca v. Decker*, No. 20 Civ. 1803, Dkt. 177 (S.D.N.Y. March 10, 2022) ("Velesaca Settlement").[1] The settlement initially applied for three years, *id.* ¶ 4, but the *Velesaca* court ordered the expiration tolled until certain defects were cured. *Velesaca v. Decker*, No. 20 Civ. 1803, Dkt. 206, at 3–4 (S.D.N.Y. Aug. 7, 2025). In response to a question from the Court in this case, respondents have confirmed continued adherence to the settlement. Dkt. 23 at 1.

As part of the settlement, respondents must conduct individualized custody determinations for every covered noncitizen. Velesaca Settlement ¶ 9. They may not adopt a blanket "no-release" policy. *Id.* ¶ 10. The individualized determination is to be done within 48 hours of initial detention, unless there are exigent circumstances. *Id.* ¶ 11. Once the determination is made, respondents will

---

[1] The settlement applies to the New York City Field Office. Velesaca Settlement ¶ 4. That covers all counties that make up the Southern and Eastern Districts of New York, plus Ulster County. *See* ICE Field Offices—New York Enforcement and Removal Operations, https://www.ice.gov/contact/field-offices?state=22&office=16&keyword= (listing the counties in the field office); 28 U.S.C. § 112(b)–(c) (listing counties in the Southern and Eastern Districts of New York).

provide oral and written communication of the decision to the detainee in a language that the person understands. *Id.* ¶¶ 12–13. And the initial custody determination "will not prejudice a covered noncitizen's ability to make any future request . . . for release." *Id.* ¶ 14. A copy of the settlement and required form is attached to this order.

Respondents aver that they are complying with the settlement in this and other cases where noncitizens may only be detained under Section 1226(a). Dkt. 23 at 1. The Court will hold the government to its representations, and considers these procedures in its analysis of the proper remedy due in this case.

## II. A.P.A. is due a new custody determination, but not immediate release

A.P.A. raises claims under both the relevant statutes and regulations as well as the Due Process Clause. The Court first addresses the process that he is due under the relevant statutes and regulations.

### A. The government violated Section 1226 and its implementing regulations

The first question before the Court is what the government *should* have done upon arresting A.P.A. While neither Section 1226(a) nor its underlying regulations say exactly how the government should go about figuring out whether someone should be detained or not, what is clear is that the agency has discretion to make that call. The statute provides that the Attorney General "may release" a non-citizen on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2). The underlying regulations provide that an officer "may, in the officer's discretion, release an alien . . . provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). And for people who were previously granted release on parole, like A.P.A., their release may be revoked (or not) "in the discretion of" the agency, *id.* (c)(9).

Whatever the scope of discretion that the agency is required to exercise under these provisions,[2] it is undisputed that the government in this case did not exercise any. Instead, the government's position at the time of A.P.A.'s arrest was that his detention was mandatory under Section 1225. The Second Circuit has since rejected that position, *Cunha*, 175 F.4th at 69, and so it is clear that A.P.A.'s rights were violated. The remaining question is what remedy he is due.

### B. A.P.A. is not entitled to immediate release

A.P.A.'s primary argument is that respondents' procedural failure entitles him to immediate (unconditional) release. That relief isn't preordained. The habeas statute doesn't compel release

---

[2] While the statute and regulations don't fully articulate what the required procedures are, the government in the Velesaca Settlement has conceded that "it is required to provide individualized initial custody determinations," Velesaca Settlement ¶ 6, *see also id.* ¶ 9, and that "consistent with applicable law and regulations, a covered noncitizen should be released (whether on recognizance, bond, or other conditions) if he or she establishes, on a case-by-case basis . . . that he or she does not present a danger to the community or a flight risk," *id.* ¶ 8.

from detention upon the finding of a violation, but instead provides courts with broad discretion to "dispose of the matter as law and justice require." 28 U.S.C. § 2243. It is true that in habeas corpus cases "[t]he typical remedy for [unlawful] detention is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). But in modern doctrine, unconditional release is generally granted only where the detention is substantively (not merely procedurally) improper, or where a procedural violation is "so egregious, its consequences so grave, and the unlawful restraints already imposed on the petitioner's liberty so lengthy or severe that law and justice mandate unconditional discharge." James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure § 33.2. This is consistent with law going back over a century. *See United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 158 (1923) (Brandeis, J.) ("A writ of habeas corpus is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and if sufficient ground for his detention by the government is shown, he is not to be discharged for defects in the original arrest or commitment." (quotation omitted)).

The required showing hasn't been made in this case. There's no substantive issue with A.P.A.'s detention: Section 1226(a) and its associated regulations permit detention. It just isn't mandatory and turns on the government's exercise of discretion. So even if the Court were to order release, there would be next to nothing stopping respondents from immediately re-detaining A.P.A. mere seconds afterward, following the procedures for individuals arrested and detained under Section 1226(a). A.P.A. concedes as much. Dkt. 19 at 3 (conceding that "the government may detain Mr. P.A. in the future so long as it obeys the Constitution and follows the requisite procedures").

That distinguishes this case from the others where this Court or other courts in this district ordered release because either the government failed to make any showing that the petitioner could be detained under Section 1226(a), or the petitioner had already been granted bond with no stated change in circumstances. *See, e.g.*, *J.G.O. v. Francis*, 2025 WL 3040142, at *5 (S.D.N.Y. Oct. 28, 2025) (petitioner already granted bond); *Carbajal v. Frazier*, 2026 WL 1309265, at *4 (E.D.N.Y. May 12, 2026) (nothing more than "conclusory" statements to justify why the petitioner was a flight risk or danger to the community). Instead, where the government has made nontrivial arguments that a petitioner could be a danger to the community (and has presented associated evidence), this Court has held that the immigration courts should determine whether the petitioner deserves bond in the first instance. *See, e.g.*, *Jimenez v. Joyce*, 2026 WL 251889, at *1–2 (S.D.N.Y. Jan. 30, 2026) (ordering a bond hearing but not release where the government presented evidence that the petitioner had repeated drunk-driving convictions). And other courts in this district have held similarly that immediate release is not the proper remedy in cases where the government erroneously claimed, before *Cunha*, that the authority to detain the petitioner derived from Section 1225. *See, e.g.*, *Rahman v. Catletti*, 2026 WL 1180138, at *1–2 (S.D.N.Y. Apr. 30, 2026); *E.A.C.F. v. Areta*, 2026 WL 1213414, at *3–4 (S.D.N.Y. May 4, 2026). Here, respondents point to A.P.A.'s prior conviction and recent arrest, which similarly present a nontrivial argument that he could be a danger to the community. Since the arrest post-dates his prior bond order, it could present a changed circumstance.

4

Further, A.P.A. was detained for only about one month before the government provided him with a custody determination following *Cunha*. Dkt. 20 at 2. That does not give rise to such an egregious violation that would demand immediate release.

Nor is there evidence that the government is denying custody determinations *en masse* within this district after *Cunha*. If, for example, the government were detaining people and refusing to provide custody determinations until a habeas petition was filed, that flouting of circuit precedent could justify immediate release. But respondents have represented to the Court that they are making individualized determinations as to everyone detained in this district, Dkt. 23 at 1, and there is no evidence to the contrary in the record.

No other authority would compel release under these circumstances. After the evidentiary hearing in this case, the Court asked A.P.A. to provide any appellate authorities that would support his proposed remedy. A.P.A. cited *Munaf*'s observation that the "typical" remedy on a habeas corpus petition is release, which is addressed above. Otherwise, he cited cases that didn't deal with the factual circumstances presented here, or didn't address the issue of remedy directly. For example, A.P.A. cited *United States ex rel. Carson v. Taylor*, 540 F.2d 1156, 1163 (2d Cir. 1973), a parole revocation case that didn't address the issue of remedy (nor is it clear that it was even disputed). A.P.A. also cited the Second Circuit's recent order in *Chen v. Almodovar*, Dkt. No. 49, No. 25-3169 (2d Cir. 2026), a post-*Cunha* case where a motions panel ordered the petitioner's release where "[r]espondents do not argue that, if [p]etitioner prevails on his claim that Section 1225(b)(2)(A) does not apply to him, he should be detained on some other ground." Here, respondents *do* contend that detention on some other ground is warranted: Section 1226(a).

In sum, the Court concludes that the circumstances presented in this case do not give rise to the remedy of immediate release. To be clear, the answer might be different in a case where (1) the petitioner had been granted bond and there was no argument that circumstances had changed; (2) there were no nontrivial arguments that the petitioner would be a danger to the community or a flight risk; or (3) there was evidence of egregious procedural violations (either in the petitioner's specific case or in the form of a broader practice).

### C.  A.P.A. is due a new custody determination

While A.P.A. is not entitled to immediate release, that doesn't end the Court's inquiry. In framing the appropriate remedy that "law and justice" require, 28 U.S.C. § 2243, the Court is guided by the Velesaca Settlement. The government concedes that those procedures would have applied to A.P.A. under Section 1226(a), and that they apply to him now. Consistent with those procedures, respondents say that A.P.A. was given a custody determination following the Second Circuit's decision in *Cunha*, and they point to a form that was completed by an ICE agent that has a single sentence to that effect. Dkt. 18-1 at 2. But beyond that sentence, respondents have not introduced any record evidence about the custody determination.

Because of the lack of information provided by respondents, and the delayed (and potentially rushed) nature of the determination—done weeks after A.P.A. was detained and during the five business days between the Second Circuit's decision in *Cunha* and this Court's hearing on the

petition—the Court cannot conclude that the custody determination was procedurally proper and reflects the procedures that respondents themselves agree apply under *Velesaca*. Respondents are therefore directed to conduct a new custody determination for A.P.A. within 48 hours of this order, consistent with the Velesaca Settlement, and to submit a sworn declaration from the officer responsible for making the decision whether to detain or release A.P.A. stating the decision made and the explanation for it, including why release on conditions of bond would be inappropriate.

A.P.A. argues that any custody determination should focus on changed circumstances and not on his prior conviction, which predates his prior release on bond. In support, he cites *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981). Respondents did not directly address that argument. While *Sugay* does not explicitly require that any custody determination look to changed circumstances, the BIA "recognize[d]" the argument. *Id.* Given that respondents did not address this argument, in the new custody determination, respondents should explicitly state whether they are relying on changed circumstances. To the extent that the custody determination relies wholly on the prior conviction, respondents should include a letter-brief addressing A.P.A.'s arguments and explaining why it is proper to focus on the prior conviction, given the IJ's prior grant of bond.

\* \* \*

A.P.A. is right that he was denied the process that the INA and its regulations afford him. But he is wrong that the remedy is immediate release. Under the authorities addressed above, as well as the Velesaca Settlement, he is due a renewed custody determination. That leaves the question of whether A.P.A. is due anything more under the Due Process Clause.

### III.    Pursuant to the Due Process Clause, A.P.A. is entitled to a bond hearing in front of an IJ where the government will bear the burden of justifying confinement by clear and convincing evidence

The Court next turns to A.P.A.'s procedural due process claim. A.P.A. argues that he was entitled to a hearing before detention; that at such a hearing, the government bears the burden of demonstrating that detention is warranted by changed circumstances; that the Court, and not an IJ, should conduct any subsequent bond hearing; and that at that hearing, the government must bear the burden to justify detention by clear and convincing evidence. Dkts. 14 at 8–10, 19 at 4–5.

#### A.    A.P.A. was not due a pre-deprivation hearing

A.P.A. first argues that the government owed him a hearing before he was re-detained, given that he was previously released from detention on bond in 2023. The Court disagrees.

A.P.A primarily bases his argument on two out-of-circuit cases, but neither is on point. *Guillermo M. R. v. Kaiser*, 791 F. Supp. 3d 1021 (N.D. Cal. 2025), dealt with detention under a different statute, Section 1231(a)(6), which "has no statutory or regulatory entitlement to a bond hearing before an IJ whatsoever," in contrast to "more protective schemes, such as Section 1226(a)." *Id.* at 1034 (cleaned up). In that context, the court held that due process warranted a hearing before re-detention. By contrast, A.P.A. is being detained under precisely the provision that the *Guillermo M.R.* court thought was "more protective." And in *Pinchi v. Noem*, 792 F. Supp.

3d 1025 (N.D. Cal. 2025), which ordered a hearing before re-detention, the court focused heavily on the circumstances of that petitioner's case, where she had no criminal history, the government could not articulate any potential danger to the community or risk of flight, there were no changed circumstances since the prior grant of release, and the government was "unable to provide *any* timeline for when [an IJ] hearing would take place." *Id.* at 1035–36. Here, A.P.A. has a criminal record, the government has articulated the potential for danger to the community based on his conviction and recent arrest, the latter of which post-dated the prior grant of release, and this Court can order a prompt IJ hearing.

Instead, the Court looks to *O.F.C. v. Almodovar*, 2026 WL 74262 (S.D.N.Y. Jan. 9, 2026). There, the petitioner had been released on bond, and he was subsequently arrested and pleaded guilty to operating a vehicle without a required ignition lock. *Id.* at *3. In *O.F.C.*, Judge Liman engaged in an exhaustive analysis of Section 1226(a) and its underlying regulations, noting that "Section 1226 does not require 'some sort of adversarial hearing-like process . . . before DHS may exercise its discretion to detain a noncitizen.'" *Id.* at *6 (quoting *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 494 (S.D.N.Y. 2025)). Turning to due process precedents, the court noted that they "undercut, rather than support, [O.F.C.'s] argument that he was entitled to notice and hearing *before* being re-arrested and detained." *Id*. at *8. Finally, the court applied the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), and held that due process did not require a pre-deprivation hearing where a prompt post-detention hearing before an IJ was available. *Id*. at *8–13.

While *O.F.C.*'s analysis was limited to the context of people who had been convicted of a crime while on parole, *id.* at *12, the Court doesn't see why the analysis would differ for those who have merely been arrested, and who will have the opportunity—if not released by the agency in the first instance—to make their case as to why the circumstances of the arrest and underlying conduct don't warrant the revocation of their parole. While there might be a slightly higher risk of erroneous deprivation (one of the *Mathews* factors) since the crime has been merely alleged, rather than proven, the Court agrees with *O.F.C.* that any such deprivation would be short lived. *See id.* at *11 ("[T]he 'truth-finding process' would [not] be materially advanced by holding a bond revocation hearing before arrest rather than shortly thereafter.").

Since A.P.A. was not due a hearing before he was re-detained, the Court need not consider whether the government would have shouldered the burden at any such hearing. Instead, the Court proceeds to consider the parameters of any hearing that A.P.A. is entitled to now that he has been detained.

### B. The Court will allow an IJ to conduct a bond hearing in the first instance

A.P.A. argues that the Court should conduct any bond hearing because of due process violations that have occurred during bond hearings before IJs. Dkt. 14 at 8–10. But to the extent that due process violations happen during *his* hearing, A.P.A. can file a motion seeking relief before this Court. Even if there may have been due process violations in some bond hearings, the record does not suggest that the violations are so pervasive to justify short-circuiting the standard process.

**C. At any bond hearing, the government will bear the burden of justifying confinement by clear and convincing evidence**

Next, A.P.A. argues that at any bond hearing the burden should be on the government to demonstrate by clear and convincing evidence that he is a danger to the community (the government does not contend that he presents a flight risk), not on him to justify release to the satisfaction of the IJ. Although this Court has not ruled on this issue, several courts in this district have held that due process requires that the government justify detention by clear and convincing evidence. *See, e.g.*, *Quintanilla v. Decker*, 2021 WL 707062, at *3 (S.D.N.Y. Feb. 22, 2021); *Reyes v. King*, 2021 WL 3727614, at *7 n.7 (S.D.N.Y. Aug. 20, 2021); *Banegas v. Decker*, 2021 WL 1852000, at *3 (S.D.N.Y. May 7, 2021).

The Court does not address whether a hearing with these burdens is required by the Due Process Clause, because respondents have stated that they do not oppose such relief. *See* Dkt. 20 at 2 ("[T]he government will accept[] a bond hearing before the Immigration Court where the Government bears the burden of proving by clear and convincing evidence that Petitioner's continued detention is justified based on his dangerousness to the community or risk of flight.").

To sum things up, should the new custody determination result in A.P.A. being denied bond, or should A.P.A. wish to challenge the amount of his bond, respondents are directed to provide him a bond hearing where the burden is on the government to justify his detention by clear and convincing evidence. The IJ must also consider alternatives to detention. *See Beltran Marroquin v. Genalo*, 2025 WL 3241161, at *3–4 (S.D.N.Y. Nov. 20, 2025).

## IV.    The Court does not address A.P.A.'s substantive due process arguments

A.P.A. also briefly makes arguments stating that mandatory detention violates his right to substantive due process. Dkt. 19 at 6. Since the Second Circuit in *Cunha* has already ruled on statutory grounds that immigration detainees like A.P.A. are not subject to mandatory detention, the Court need not address whether substantive due process also leads to a similar result.

## CONCLUSION

The petition is GRANTED and A.P.A. is ordered conditionally released unless respondents comply with the following requirements: Respondents are directed to provide A.P.A. with a new custody determination within 48 hours in line with the Court's opinion. Should A.P.A. be denied release, then within two days, respondents should provide the Court with an explanation of the individualized determination it provided to A.P.A. as specified above, including whether its determination was based, in whole or in part, on A.P.A.'s prior conviction.

If A.P.A. is denied release (or if A.P.A. wishes to challenge the terms of his release, including the amount of any bond), then respondents are also directed to provide A.P.A. with a bond hearing within seven days of the adverse determination, where the burden is on the government to justify detention by clear and convincing evidence. Respondents are directed to submit a letter to the Court with the outcome of the new custody hearing within 48 hours after it happens, along with a transcript or audio recording of the hearing.

The Clerk of Court is respectfully directed to enter judgment granting the petition and granting conditional release, unless respondents provide A.P.A. with the relief specified above. The Court retains jurisdiction over this case for any further necessary proceedings.

SO ORDERED.

Dated: June 3, 2026
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE L. VELESACA and ABRAHAM CARLO UZATEGUI NAVARRO, on their own behalf and on behalf of others similarly situated,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>THOMAS R. DECKER, in his official capacity as New York Field Office Director for U.S. Immigration and Customs Enforcement; TAE D. JOHNSON, in his official capacity as the Acting Director for U.S. Immigration and Customs Enforcement; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; ALEJANDRO MAYORKAS, in his official capacity as Secretary of the U.S. Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; CARL E. DUBOIS, in his official capacity as the Sheriff of Orange County,[1]<br><br>Respondents-Defendants. | Case No. 20 Civ. 1803 (AKH)<br><br>**STIPULATION AND ORDER OF DISMISSAL AND SETTLEMENT** |

This Stipulation and Order of Dismissal and Settlement ("Stipulation and Order") is entered into by and between the Petitioners-Plaintiffs and the Respondents-Defendants to the above-captioned action by and through their attorneys (collectively, the "parties").

WHEREAS, in February 2020, the petitioners commenced this action, and subsequently filed an amended complaint in March 2020, seeking declaratory and injunctive relief based on claims pertaining to a "No Release Policy" allegedly implemented by U.S. Immigration and Customs Enforcement's ("ICE") New York City Field Office in 2017;

WHEREAS, ICE's New York City Field Office disputes the allegations in the amended complaint and does not concede that it ever had a "No Release Policy";

---

[1] Tae D. Johnson and Alejandro Mayorkas are automatically substituted for Mathew Albence and Chad Wolf, respectively, pursuant to Fed. R. Civ. P. 25(d).

WHEREAS, on March 31, 2020, the District Court for the Southern District of New York granted the petitioners' motion for a class-wide preliminary injunction;

WHEREAS, while there are open legal issues and factual disputes, including, in the government's view, with respect to subject matter jurisdiction and the merits of the case, the parties wish to resolve this action without further litigation and pursuant to the terms and conditions contained herein;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between the parties, that the action shall be resolved between them as follows:

1. This Action is hereby dismissed with prejudice.

2. This Stipulation and Order, including the terms and conditions set forth below, is the result of the parties compromising and settling disputed claims. Neither this Stipulation and Order nor any representations made by either party in the course of negotiating this Stipulation and Order shall constitute or be construed as any admission of liability or wrongdoing by either party, or by their present or former officers, employees, agents, successors, assigns, or representatives, related to any claims or defenses that were raised (or could have been raised) with regard to this Action.

3. The terms and conditions discussed below are not applicable to Respondent Sheriff Carl Dubois or Orange County, New York.[2]

4. The terms and conditions discussed below are not applicable to any field office other than the New York City Field Office of ICE's Enforcement and Removal Operations ("ERO-NY"), unless otherwise specified in this Stipulation and Order. Such terms and conditions shall remain in effect for three years following the date that the Court approves and enters the Stipulation and Order on the docket, subject to any tolling of the three-year duration due to a finding of non-compliance as set forth herein.

_____

[2] Sheriff Dubois was named as a respondent in his official capacity as the immediate physical custodian of the two named petitioners who were detained at the Orange County Jail at the time this action was filed.

20 Civ. 1803 (AKH)

Initial Custody Determinations

5. For purposes of this Stipulation and Order, the parties' agreement applies only to noncitizens initially arrested and detained under 8 U.S.C. § 1226(a) by ERO-NY who have not yet received a bond hearing before an immigration judge, with the exception of noncitizens covered under the *Flores* Settlement Agreement and former unaccompanied noncitizen children who are transferred from the custody of the Department of Health and Human Services to ICE when they turn eighteen years of age (defined as "covered noncitizens").

6. ERO-NY agrees that it is required to provide individualized initial custody determinations to covered noncitizens.

7. The parties agree that initial custody determinations are discretionary, and covered noncitizens are not guaranteed any particular outcome.

8. ERO-NY agrees that, consistent with applicable law and regulations, a covered noncitizen should be released (whether on recognizance, bond, or other conditions) if he or she establishes, on a case-by-case basis, to the officer's satisfaction that he or she does not present a danger to the community or a flight risk, including whether if one or more special vulnerabilities warrant release as a matter of discretion in light of the individual circumstances.

9. ERO-NY agrees that it will conduct individualized initial custody determinations for each covered noncitizen in accordance with applicable statutory and regulatory requirements, as well as any applicable policy guidance in effect at the time of the initial custody determination.

10. ERO-NY agrees that it will not adopt a blanket "no-release" policy, *i.e.*, a policy of denying release to covered noncitizens without considering the individual circumstances in each case.

11. ERO-NY agrees that it will conduct initial custody determinations within 48 hours of the covered noncitizen's arrest by ERO-NY unless there is an exigent circumstance that

20 Civ. 1803 (AKH)

impedes the determination, in which case a determination will be made as soon as practicable.

12. ERO-NY agrees that, consistent with existing rules and regulations, communications with covered noncitizens during the initial custody determination process will be conducted in a language that the person understands.

13. ERO-NY agrees that, at the time that an initial custody determination is made, ERO-NY will provide oral and written notification of the decision to the covered noncitizen.

14. Receipt of an initial custody determination will not prejudice a covered noncitizen's ability to make any future request to ERO-NY for release, nor to seek release at a custody redetermination hearing (*i.e.*, a bond hearing) before an immigration judge.

Ability to Pay

15. ERO-NY agrees that, during the initial custody determination, its officers will consider, among other things, a covered noncitizen's financial ability to pay when assessing a bond amount. This consideration may include, but is not limited to, asking the covered noncitizen how much they believe they would be able to post, whether they are presently employed and the length of that employment, and whether they have family or friends that would be able to assist them with posting bond. ERO-NY officers should consider the totality of the circumstances presented when determining the amount of bond or other conditions of release.

16. ERO-NY is not required to set a bond that a covered noncitizen can afford in every case.

17. If ERO-NY sets a bond, with or without alternative conditions of release, the minimum amount of bond remains the amount set by statute at 8 U.S.C. § 1226(a)(2), which is currently $1,500.

18. ERO-NY is not required to release any covered noncitizen for whom it has determined that no bond or alternative conditions of release would be sufficient to ensure the person's appearance if such detention is otherwise permissible by law.

Page 4 of 12

20 Civ. 1803 (AKH)

Disability

19. ERO-NY agrees that its officers will consider whether a covered noncitizen has a disability as part of the initial custody determination.

20. In conducting this assessment, ERO-NY agrees to instruct its officers to employ the Americans with Disabilities Act's definition of disability: "a physical or mental impairment that substantially limits one or more major life activities."

21. For covered noncitizens, ERO-NY officers will consider an identified disability under the totality of the circumstances when making initial custody determinations. When determining whether to release or detain a covered noncitizen, ERO-NY officers will consider whether a detention facility that can reasonably accommodate the disability is available.

22. ERO-NY is not required to release a covered noncitizen with a disability in any case if such detention is otherwise permissible by law, for example, if the individual's disability can otherwise be accommodated within a facility.

Initial Custody Determination Worksheet

23. ERO-NY agrees to use the Initial Custody Determination Worksheet (attached as Exhibit A) when conducting initial custody determinations for all covered noncitizens.

24. ERO-NY agrees that its officers will complete the entire worksheet, except that officers will not be required to complete the flight risk section if the covered noncitizen has been determined to be a danger to property or persons. Completing this worksheet includes marking applicable check boxes, signing and dating the worksheet with the completion time noted, and noting the primary considerations affecting the officer's analysis in the "discussion" space on the worksheet. Officers are not required to list on the worksheet all considerations or factors that were considered or affected the initial custody determination.

Advisal Notice

25. ERO-NY agrees to provide an Advisal Notice (attached as Exhibit B) to each covered noncitizen at the beginning of processing and before commencing an initial custody determination.

26. ERO-NY agrees to communicate with the covered noncitizen in a language they understand, including providing them with a translated version of the Advisal Notice in that language or arranging for an interpreter to read the form to them.

27. ERO-NY agrees to keep translated copies of the Advisal Notice on file at the New York City Field Office in the following languages: English, Spanish, Mandarin, Russian, Punjabi, Portuguese, Haitian Creole, Arabic, French, Hindi, and Bengali.

28. ERO-NY agrees to provide the covered noncitizen with reasonable time to review the Advisal Notice and complete the certification at the bottom of the notice prior to the initial custody determination.

29. ERO-NY will not require the covered noncitizen to sign the Advisal Notice if they decline to do so. In that circumstance, ERO-NY will note on the form that the covered noncitizen "Refused to Sign."

30. ERO-NY agrees to continue to provide each covered noncitizen with a list of free or low-cost legal service providers (*i.e.*, the approved list of legal service providers prepared by the Executive Office for Immigration Review).

Training

31. ERO-NY agrees that it will provide training on the terms of this Stipulation and Order to all of its officers (*i.e.*, to ERO officers within the ERO New York City Field Office) who conduct or directly supervise initial custody determinations for covered noncitizens at any point during the pendency of this Stipulation and Order. The first

20 Civ. 1803 (AKH)

of such trainings will be conducted within 40 days following the date the Court approves and enters the Stipulation and Order on the docket.

32. Consistent with the terms of this agreement, the substance of the training shall be in the sole discretion of ICE and ERO-NY.

33. ERO-NY agrees to provide petitioners' counsel with a copy of the PowerPoint training slides that will be used at the trainings related to this Stipulation and Order, and such slides will be provided within 5 calendar days of the first training session. If the training slides are modified any time during this agreement, ERO-NY agrees to provide petitioners' counsel with a copy of the modified PowerPoint training slides within 5 calendar days of the first training session where such modified training slides were used.

34. ERO-NY agrees to provide petitioners' counsel with quarterly reports of the dates of any trainings related to this Stipulation and Order and the number of officers that attended each training, and will also specify how many Deportation Officers (DOs), Supervisory Detention and Deportation Officers (SDDOs), Assistant Field Office Directors (AFODs), and Deputy Field Office Directors (DFODs) attended each training.

35. The above-referenced training slides and quarterly reports will be produced to petitioners' counsel subject to the stipulated protective order (ECF No. 90).

Reporting

36. ERO-NY agrees to provide petitioners' counsel with ongoing, timely, and accurate reporting, as described in the paragraphs immediately below, for the three-year duration of the terms and conditions of this Stipulation and Order, subject to any tolling of that period.

37. ERO-NY agrees to provide petitioners' counsel with the Initial Custody Determination Worksheets for all covered noncitizens on a monthly basis. The worksheets will be

**20 Civ. 1803 (AKH)**

Case 1:20-cv-01803-AKH   Document 175   Filed 03/10/22   Page 8 of 12

provided to petitioners' counsel within the first ten calendar days of each month, and such production will be subject to the stipulated protective order (ECF No. 90).

38. ERO-NY agrees to provide petitioners' counsel with quarterly reports (every three months), tracking the fiscal year, containing certain data from the Risk Classification Assessment ("RCA") module (set forth in the next paragraph), in excel format, as it pertains to each covered noncitizen. Each quarterly report will be provided to petitioners' counsel within 30 days of each covered three-month reporting period, and such production will be subject to the stipulated protective order (ECF No. 90). For example, the report for the second quarter of Fiscal Year 2022 is due July 30, 2022.

39. ERO-NY agrees that the quarterly reports referenced immediately above will contain the following information for each covered noncitizen, subject to the limitations contained in the next paragraph:

a.   name;
b.   A-number;
c.   RCA public safety risk score;
d.   RCA flight risk score;
e.   RCA special vulnerabilities[3];
f.   RCA mandatory detention per statutes and allegations;
g.   RCA decision type;
h.   RCA recommendation;
i.   RCA recommended bond amount;
j.   RCA officer agree/disagree;
k.   RCA supervisor agree/disagree;
l.   RCA final decision;
m.   RCA final bond amount;
n.   RCA decision date;
o.   ICE book-in date;
p.   RCA encounter date;
q.   gender;
r.   country of citizenship;
s.   age at time of RCA decision;
t.   pending charges & convictions at time of RCA decision;[4] and
u.   INA charges at time of RCA decision.

---

[3] This data field includes, where appropriate, a specific reference to the type of special vulnerability.
[4] This data field includes, where appropriate, a specific reference to the pending charge or conviction.

**20 Civ. 1803 (AKH)**

40. As noted immediately above, ERO-NY agrees to provide quarterly reports containing the above data for covered noncitizens, but only to the extent that such fields are in use at the time that the initial custody determination is made by ERO-NY. Nothing herein shall restrict ICE from making changes to the RCA platform. If ICE modifies the RCA in a way that removes or renders a data field void, ERO-NY will notify petitioners' counsel if a data field listed above is no longer available or active in the RCA platform during the quarterly production in which the data field is removed from the report.

41. ERO-NY agrees to provide the following instruction concerning the RCA to its officers conducting initial custody determinations: "As currently programmed, the Risk Classification Assessment (RCA) tool issues the following recommendations: 'Detain by the Department of Homeland Security' or 'Supervisor to Determine-Detain or Release on Community Supervision.' Because the RCA may not recommend solely 'Release' or 'Release With Bond,' it is important that you remember that these options are always available on a case-by-case basis for those detained under 8 U.S.C. § 1226(a). The RCA is **not** the final decisionmaker. Instead, you should conduct an individualized custody determination in accordance with agency guidance, policies, and relevant trainings."

Attorneys' Fees, Costs, and Expenses

42. ICE agrees to pay petitioners' counsel the amount of $75,000 in full satisfaction of any claim against any Defendant for attorneys' fees, costs, and expenses in this Action. Such payment will be made within 90 days following the date the Court approves and enters the Stipulation and Order on the docket.

43. The parties mutually agree to waive any additional claims either party may have against the other party for any additional fees, costs, or expenses related to this Action.

44. This Stipulation and Order shall not be construed as a determination, admission, or concession that either party is a prevailing party or substantially prevailed in any respect of events or matters that are at issue in this Action.

20 Civ. 1803 (AKH)

Implementation

45. ERO-NY will implement the terms laid out in this Stipulation and Order within thirty calendar days following the date that the Court approves and enters this Stipulation and Order on the docket (the "Implementation Date"), unless otherwise specified within this Stipulation and Order.

46. Within 10 calendar days of the Implementation Date, ERO-NY will provide petitioners' counsel with a copy of any written broadcasts instructing ERO-NY officers to begin utilizing the Initial Custody Determination Worksheet and Advisal Notice, subject to the stipulated protective order (ECF No. 90), and will confirm that all ERO-NY officers who are currently conducting initial custody determinations have received the relevant training.

Enforcement and Compliance

47. The Court will retain jurisdiction to enforce the terms of this Stipulation and Order for its duration. Consistent with the terms of this agreement, such retention does not extend to or provide for challenges to ERO-NY's individual discretionary determinations as memorialized on the Initial Custody Determination Worksheets, although such worksheets may be evidence of noncompliance with the terms and conditions of this Stipulation and Order.

48. As third-party beneficiaries, covered noncitizens will have standing to enforce the terms of this agreement. The petitioners will also have standing to enforce the terms of the agreement. Defendants agree not to contest their standing to enforce the terms and conditions of the Stipulation and Order.

49. The parties commit to work in good faith to resolve any disputes concerning compliance with the Stipulation and Order prior to bringing such disputes to the Court.

50. If either party has a good faith belief that the other party is not in compliance with the terms of this Stipulation and Order, counsel for the complaining party shall promptly notify counsel for the other party, in writing, of the specific grounds upon which such

20 Civ. 1803 (AKH)

noncompliance is alleged (the "Notice of Dispute").  Notice shall be provided to counsel of record as noted on the district court docket sheet.

51. The parties shall promptly meet and confer in a good faith effort to informally resolve the dispute no more than 14 calendar days after the service of the Notice of Dispute, unless the parties agree otherwise.

52. If the dispute cannot be resolved within 21 calendar days of the meet and confer, then either party may move to enforce the Stipulation and Order with the Court.

53. If the Court finds that Defendants are out of compliance with the Stipulation and Order, other than with respect to the Reporting terms, and that such noncompliance was material, the period of such noncompliance will not accrue towards the three-year duration.  Absent an explicit finding to the contrary, the presumed period to be tolled runs from the date the Notice of Dispute was received by the opposing party until the defect has been cured.

54. A finding of noncompliance with respect to the Reporting terms shall not provide a basis to toll or extend the three-year duration.

Entirety of Agreement

55. The parties understand and agree that this Stipulation and Order, including the attached exhibits, contains the entire agreement between them, and that no statements, representations, promises, agreements, or negotiations, oral or otherwise, between the parties or their counsel that are not included herein shall be of any force or effect.

56. No amendment, change, or modification to this Stipulation and Order shall be valid unless in writing and signed by counsel for all parties.

57. For purposes of construing this Stipulation and Order, this Stipulation and Order shall be deemed to have been drafted by all parties to this Stipulation and Order and shall not, therefore, be construed against any party for that reason in any subsequent dispute.

New York, New York
March 10, 2022

/s/ Amy Belsher
AMY BELSHER
New York Civil Liberties Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
abelsher@nyclu.org

/s/ Jenn Rolnick Borchetta
JENN ROLNICK BORCHETTA
The Bronx Defenders
360 E. 161st Street
Bronx, N.Y. 10451
Tel: (718) 838-7878
jennb@bronxdefenders.org

Counsel for Petitioners-Plaintiffs

New York, New York
March 10, 2022

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

BRANDON M. WATERMAN
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2741
brandon.waterman@usdoj.gov

Counsel for Respondents-Defendants

SO ORDERED:

HON. ALVIN K. HELLERSTEIN
United States District Judge

March 10, 2022

Page 12 of 12

20 Civ. 1803 (AKH)

# EXHIBIT A

## Initial Custody Determination Worksheet

ERO NEW YORK CITY FIELD OFFICE

## INA § 236(a) Initial Custody Determination

Name _____     A-Number_____     Arrest Date & Time_____

☐ Individual is subject to § 236(a)—(Fill Out Below)
☐ Individual is NOT subject to § 236(a)—(Skip to Bottom and Sign)

**Instructions**: Pursuant to a settlement reached in *Velesaca v. Decker*, No. 20-cv-1803 (SDNY), ERO Officers at the New York City Field Office must utilize this form as part of the initial individualized custody determination under INA § 236(a). Detention under INA § 236(a) is discretionary, and ERO officers must make individualized determinations in each case.

Pursuant to federal regulation 8 C.F.R. § 236.1(c)(8), in making an initial custody determination under INA § 236(a), ERO may release a noncitizen who establishes to the satisfaction of the immigration officer that (1) the noncitizen does not pose a danger to persons or property, and (2) the noncitizen is likely to appear at all future proceedings.

When conducting an individualized initial custody determination, the officer must first consider whether the noncitizen has demonstrated that he or she is not a danger to property or persons. Only if the noncitizen has satisfied the immigration officer that he or she is not a danger to property or persons should the officer proceed to a flight risk analysis.

**Danger to the Persons or Property:**
In assessing whether an individual currently presents a "danger to persons or property," officers may consider any relevant factors, including, but not limited to: the extensiveness and seriousness of any criminal arrest or conviction; the length of time that has passed since any such arrest or conviction; the sentences imposed; criminal history not known to the immigration officer but disclosed by the noncitizen; statements from the noncitizen regarding dangerous or illegal conduct; evidence of rehabilitation; compliance with sentences; employment history and ties to the community. This list is non-exhaustive and does not preclude officers from considering other aggravating or mitigating factors relevant to determining whether the individual currently presents a "danger to persons or property."

Has the individual established that he/she does not pose a danger to persons or property?
☐ Yes ☐ No

Discussion (if more space is needed, please attach additional page(s)):

_____

_____

_____

*Please see back of form*

1

ERO NEW YORK CITY FIELD OFFICE

**Flight Risk:**
Factors to consider for flight risk may include, but are not limited to: whether the individual has a fixed address in the U.S.; the length of residence in the U.S.; family ties in the U.S.; employment history; record of appearance in court; criminal history (including how recent and serious); identified disabilities or medical conditions; history of immigration violations; manner of entry into the U.S.; attempts to flee prosecution; and whether an individual has upcoming court dates in state or local courts.

Has the individual established that he/she does not pose a flight risk?  ☐ Yes  ☐ No

If the noncitizen does pose a flight risk, have you determined that no forms of release on conditions can mitigate the risk of flight?  ☐ Yes ☐ No

Discussion (if more space is needed, please attach additional page(s)):

_____

_____

_____

**Special Vulnerabilities:**
The officer should consider whether the noncitizen has any identified special vulnerabilities, such as physical illness; mental illness; disability; elderly; pregnant; nursing; primary caretaking responsibility; sexual orientation/gender identity; or other special circumstance that warrants consideration. No one factor is determinative.

Have you asked and considered whether the individual has any special vulnerabilities?
☐ Yes ☐ No

Have you identified a special vulnerability? ☐ Yes ☐ No

*Please ensure your determination is consistent with current statutory and regulatory authority and applicable agency guidance.*

**INITIAL CUSTODY DETERMINATION**

☐ Bond is set at _____
☐ Release to ATD or other conditions

☐ Release on Recognizance
☐ Detain

Supervisory Detention and Deportation Officer: _____

Date: _____   Time Completed*: _____
(* if not e-signed)

2

# EXHIBIT B

## Advisal Notice

ERO NEW YORK CITY FIELD OFFICE

## IMPORTANT INFORMATION ABOUT
## SECTION 236(a) INITIAL DETENTION DECISIONS

*NOTE: This form must be provided to an arrested person at the beginning of processing.*

1. ICE will make an individualized determination as to whether you will be detained or released, and if released, the conditions of release.

2. Under the current regulation, you bear the burden to demonstrate to the officer that you do not pose a danger to property or persons, and that you are likely to appear at all future proceedings.  8 C.F.R. § 236.1(c)(8).

3. You may choose to answer or not answer any questions at any time. Any statement you make may be used against you in a subsequent proceeding, including without limitation by ICE or an Immigration Judge, and including in deciding whether you will be detained or whether you will be removed from the United States.

4. You have a right to be represented by an attorney or accredited representative of your choosing at no expense to the federal government.  ICE will provide you with a list of free or low-cost legal service providers in case you cannot afford an attorney.

5. An immigration officer will communicate with you in a language you understand.

6. You may refuse to sign any document.

7. If you are detained, you may request a custody redetermination from ICE or seek review before an Immigration Judge.

## CERTIFICATION

I have read this Notice or had the Notice read to me in the _____ language.

[    ] Yes                                    [    ] No


_____          _____          _____
Signature of Arrested Person          Printed Name of Arrested Person          Date


Method of Interpretation/Interpreter: _____

Interviewing Officer Name: _____